Thank you, Your Honor. 203069, James Mammone v. Charlotte Jenkins. Arguments not to exceed 15 minutes, 30 minutes per side. Ms. Wernicke for appellate. I apologize to the court for getting ahead of myself. I'm sure it was due to eagerness to hear your argument. Well, thank you, Your Honor. May it please the court. Trial counsel knew there would be no question of Mr. Mammone's guilt at trial. The state's evidence was overwhelming against him. This was clearly a mitigation case from day one. Trial counsel should have retained and presented testimony from a qualified neuropsychologist who could have explained that Mr. Mammone's serious mental illness was the catalyst for this tragic event. There is a reasonable probability that had the jury been fully informed of Mr. Mammone's serious mental illness issues by a qualified neuropsychologist, the result would have been different and he may not have been sentenced to death. This error worked to Mr. Mammone's actual and substantial prejudice. Capital cases are always difficult, especially at this stage of the process, as Your Honors know. This case is more difficult because of the unimaginable actions taken by Mr. Mammone. Logic suggests that by the very nature of the crime, there must have been something seriously wrong with Mr. Mammone. He was represented at trial by the Stark County Public Defender Office. They chose to use Dr. Jeffrey Smalden, a forensic clinical psychologist. By that time though, Dr. Smalden had been widely, maybe overly used in capital trials. As the district court noted, Dr. Smalden had been involved in at least 250 capital cases at that time. Well, if he had been involved in two, you would tell us he was underqualified. No, Your Honor. I mean, what's the rule, 50 to 150 and over that, too many and under that? I'm sure you would be telling us it was too few. No, Your Honor. Actually, that's not my point. The point is Dr. Smalden is well qualified for what he did. He's now retired. But he, at the time, he was a very well qualified clinical psychologist. However, he was not a neuropsychologist, even as Judge Carr acknowledged in his district court opinion. And that was to the detriment of Mr. Mimone that Mr. Mimone's trial counsel didn't recognize that they shouldn't go with just the guy they always go to. They needed somebody more specialized and more nuanced in order to fully present the serious mental illness that Mr. Mimone suffers from. And that's the point. It's not that Dr. Smalden isn't qualified. He's very qualified, but he was very overused by trial. What is the rule? So had there been no expert, that would be one thing. Correct. No expert who could testify at all about mental capacity. There's an expert here who is well qualified. So your rule is that we have to pick subspecialties, and if an expert isn't as well qualified in a subspecialty, then the counsel is obligated to find another expert and get court's approval for that. In other words, there are lots of experts who testify in these cases. So what's the rule in your mind? Thank you, Your Honor. The rule is that it is the rule by Strickland and its progeny, Wiggins and Rompella, that trial counsel needs to know what their case is about from the beginning. They were qualified. The trial counsel were experienced capital litigators. They should have recognized that this case was going to be just about mitigation. They were going to need more than just the go-to guy. They were going to need more specialized experts in order to fully reveal and understand Mr. Mimone's serious mental illness. Does this argument presuppose that there's somebody out there meeting the specialty requirements that you suggest who would give an opinion that Mr. Mimone was not guilty by reason of insanity? Yes, Your Honor. That is one aspect. What I'm mainly arguing today is the mitigation. That counsel was ineffective for not getting a neuropsych for mitigation. The doctor that we retained, Dr. Mosnick, did also find that he would have met the criteria for not guilty by reason of insanity. And I think that that even encompasses even the mitigation part. The issues that she uncovered that she was able to reveal from her knowledge and research and testing and review of Mr. Mimone's records was that he has autism and that that had never been revealed before that had happened. She's a neuropsychologist? Yes, Your Honor. This is the same argument you were making before. You're just giving how it was prejudicial now. Yes, Your Honor. So at the time of the trial, there would have been a neuropsychologist who could have done what Dr. Mosnick did. I believe that was your question. That would have led to a... Please go ahead. I phrased, I heard you when you said initially you were speaking about mitigation. But then I asked you a question that didn't assume what you had just told us. So I'm listening now. I mean, I was listening before, but I understand your argument. Yes. And the issue is that the complexity of the mental health issue in this case. I mean, it's a very simple case from the state's perspective about his guilt. I mean, he admitted, Mr. Mimone admitted, and he wrote the letter to the local newspaper. So there really was not going to be any question of guilt. He actually would have wanted to plead guilty and take three life without parole sentences, and the prosecution wouldn't agree to it. So the issue for the jury was going to be that the trial counsel needed to be able to explain to the jury why someone who would do what he did, because it's so contrary to everything we know and everything we understand. And Dr. Mosnick revealed he has the delusional disorder. That's why he seems, and the autism, and that's why he seemed very cold and detached, both in his. When were these claims, I'm asking these questions to get what our scope of review is. When were these claims first made in the district, in the state level? Post-conviction counsel raised that trial counsel was ineffective for not retaining a neuropsychologist. They had requested funding from the post-conviction court. That was rejected by the state courts. It was rejected, correct. Well, it was rejected because they had requested funding for a neuropsych and were denied. And then the district, the trial court and post-conviction and the court of appeals said, well, you haven't shown prejudice for what a neuropsych would have done. And the reason why they couldn't show prejudice is they were denied funding. So the circular logic of. I understand, but right now I'm asking what level of deference we give to their decision, right? Yes. You're going to be challenging the decision. Yes, Your Honor. And the deference is the good question. So the deference is, you give deference to what the post-conviction court did when they denied the neuropsych, saying, well, you don't win because you didn't show prejudice, but we're not going to give you the money to fund an expert that would have shown prejudice. You're saying they made a bad decision. They did make a bad decision. I understand that argument. I'm trying to ask what we do with that. If the state courts make a bad decision, we normally have to uphold it, except in extraordinary circumstances. That's not the way it reads. Right. But the deference is pretty deferential. Yes, Your Honor. So I'm trying to figure out, is this an AEDPA case or not? And you seem to be saying it's a very strong case. So it's an AEDPA case for the issue of trial counsel not retaining a neuropsych. It has been exhausted, and the court ruled on it. The state court ruled on it. So there's some deference to that. But then the prejudice part, because they were denied the funding, we were able to do the funding. I know you're going to probably ask about Shin v. Ramirez. Post-conviction counsel was not ineffective in the sense that they missed a claim or they overlooked an important claim or that they were negligent. Post-conviction counsel recognized that there was a serious issue about Mr. They qualified neuropsychologists to do a complete review. But they were denied the funding because the state court system at the time did not allow post-conviction courts to give money for experts in post-conviction. That was ruled on by the state court? Yes. So you would answer yes, AEDPA applies. If you want to say no, I don't understand. AEDPA does not apply on the prejudice part, Your Honor, is my argument, because the They decided that as well, right? But they didn't have an expert report. They decided you didn't show prejudice because you don't have an expert report. You sort of have two claims. One depends on the other, and they're both raised and they're both rejected, but we still don't apply AEDPA because Because the state court did not have the facts that we have now. Well, you know, at some point we have to feel, to put this in lay terms, we have to feel that it would have made a difference. Yes. And so here you look at what was, well, we look at the facts of the offense itself. We look at Mr. Mamone's behavior. We look at what was in the record. And it becomes at some point pretty speculative, arguably, that a neuropsychologist would have made, or anything he might have said, he or she, would have made any difference in what the jury felt as far as the appropriate penalty in this case. That's one way to look at it, Your Honor. And the problem with that is that is making an assumption that no matter what mitigation was presented, the jury would have automatically given him the death penalty. Well, at some point we have to evaluate whether it would have made any difference. Yes. And our argument is it would have made a difference. It could have made a difference. We only had to convince one juror that his delusional disorder and his autism, especially his delusional disorder, were the catalysts that created this tragic event. He's very much going to be punished for the rest of his life, whether he's in prison for the rest of his life or the state execute him. There's no question about that. He's not seeking to be released. He's not seeking to get out. He just doesn't want to be executed. And we don't want him to be executed. And it could have made a difference to this jury. The whole idea about the issue about his mental health and what his true mental illness is affects every stage of the proceeding, right? So if a neuropsych had been retained at trial, and that neuropsych, like Dr. Mosnick, if she'd been able to present evidence of his autism, of his delusional disorder, of his manic depressive disorder, that would have set the tone for all the appeals from then on, even at this court. The testimony that would have been given at the guilt phase or the penalty phase? In other words, I thought you conceded that any jury would find him guilty of the crimes. Any jury would have found him guilty. The argument is cabin to the penalty phase, right? I'm arguing just the penalty phase. We do have an argument about the not guilty by reason of insanity, but that even admits guilt. Can we stick to this one? Right. Yes. There's clearly evidence. He's clearly guilty. There's no question at all about his guilt. Your narrow argument is that it was below constitutional standards for his lawyer at the penalty phase to only have one expert and not two, and that the post-conviction counsel was deficient and not recognizing that deficiency. No, Your Honor. The post-conviction counsel did recognize the deficiency. That's the post-conviction. I'm sorry. The court, the state court. Yes. The state court faulted post-conviction counsel for not proving prejudice when they didn't give them the funds that would have helped them prove, that would have given them the tools they needed to prove the prejudice. Was that argued to them? Was that argued? Yes. Yes. Post-conviction counsel argued. I didn't mean to interrupt you. No, go ahead. So that even though your argument is that one error infected the other one, made it worse, made it more likely to be a problem, but still two different errors in concept, and AEDPA applies to each one separately or not? Our argument is that. Because each one is, I mean, this was presented, right? The issue about the trial counsel being ineffective for not having a neuropsych was raised, but the issue about prejudice was that was an unreasonable application of the facts because they denied the funds for an expert. It's unreasonable, but you can't say AEDPA deference doesn't apply. You just say it applies, but it meets AEDPA. But the deference doesn't apply because they didn't have the facts that we have now. At least you see what I'm concerned about. Yes. And the Shin v. Ramirez leaves a little bit of a crack for us habeas counsel to argue because in Shin v. Ramirez there's lots of talk about post-conviction counsel errors are imputed to the client, even though the client has no control really over what post-conviction counsel does. But in this case, it wasn't that post-conviction counsel didn't do their job correctly or didn't recognize that there was a serious issue. They did, and they did everything they could to get the facts that they needed to raise the issue. And, you know, Judge Carr conflated the – when he was reviewing this, he conflated the issue about trial counsel being ineffective and post-conviction counsel being ineffective. Just to go back to the sort of cause, maybe this goes to prejudice, but his lawyer argued during the penalty phase that he had serious psychological issues. So it wasn't as if this argument wasn't presented to the jury. You're saying it was presented in a more refined way if he had the second expert as opposed to just one? Trial counsel argued she actually did not incorporate Dr. Smuldin's testimony into her closing argument, and she actually referred to him, to Mr. McMone, as a unabomber. I submit to you that the evidence is clear that James suffers from a severe psychological disorder. That's what she told the jury. Right, right. But she also equated him to the unabomber, which doesn't really – I'm going to ask you to pause. Yes. We don't have any lights, so we can see when her time is up. Oh. Judge, for some reason, they put it down on the podium. I don't know if it has to do with the court. Well, we can't see it. I understand. Oh. Right now time is not okay. Yeah. Gotcha. Sorry, I didn't realize that. I mean, I suddenly – I thought, well, what am I going to do? I'm not going to know when she's – She's going to have some compensatory time. Give her about another minute. Okay. Thank you. One thing if the counsel just didn't argue mitigating circumstance, here they did, and I guess your argument is ineffective to not get a second expert to argue it more – I mean, is there something – Well, it's not even that they needed to get a second expert because they should have even just gotten a neuropsych instead of maybe Dr. Smaldin. It's not necessarily that they needed to get multiple experts, but this case is – the mental health part of it is more complicated than a normal death penalty case where Dr. Smaldin would be qualified and competent to do it. And, again, the issue is that they did not recognize – for instance, they knew that Dr. – that Mr. Mimone was seeing a therapist for at least a year or two before, and he'd been already diagnosed with major depressive disorder. And Dr. Smaldin didn't see anything about that and didn't understand it, and it was manic depressive disorder with psychotic features. That is kind of a precursor to bipolar, and Dr. Smaldin apparently did not screen Mr. Mimone for mania to see what in his past of any manic episodes. And that is important because Dr. Mosnick did, and her finding is that his delusional disorder, autism, and he had the major depressive disorder with psychotic features, which Dr. Smaldin did not find. He disagreed with all the other doctors who had evaluated him, and Dr. Smaldin just diagnosed him with a personality disorder. He's done so many cases. I assume you've retained him before in cases? I have not retained him for, no, because most of the cases where he's been involved, he has been the trial or the post-conviction. So in my work as habeas, I have not retained him. The only time we actually paid him was when he came to speak at a clemency hearing about his review of a client before. So, no, I have not. A fair way to say he's probably been retained in a lot of cases. Yes. He has been retained in a lot of cases that we have handled. And he's a very nice guy. What he does, he does. I'm not on trial here. Right. Well, it kind of feels like Dr. Smaldin's on trial, and we're not. We agree he's quite experienced. Yes. So, you know, it's just the very limited nature of this case and the unique circumstances of Mr. Mimone that make it more important that it needs to be somebody other than Dr. Smaldin. And it needs to be an expert who can delve into these very serious health issues, mental health issues of, you know, the autism issue would have explained why Mr. Mimone's effect at trial, his five-hour unsworn statement where he just told his life story and felt like it was very flat and very not remorseful, when, in fact, he does have remorse. He just doesn't show it. He's on the autism spectrum. You know, Dr. Smaldin found that his IQ score, that he was very intelligent, but there was a differential between the verbal and the performance, like over 20 points. That is a clear sign of organic brain impairment, and Dr. Smaldin didn't see it. Dr. Smaldin also didn't notice that when he gave him the MMPI, he said, if I didn't know this guy, I would have thought he was psychotic because of all the mental health issues that appeared on it. Well, that should have been a clue to Dr. Smaldin and, more importantly, to his trial counsel that maybe they needed to get another expert or get somebody else to look at this because there was something. Everybody agreed there was something seriously wrong with James and that they needed to be able to explain it to the jury better to make them kind of understand his very unique circumstance because the state made him out to be very cold and not having any remorse, which is understandable if you're looking at the cold record, but he does have remorse for what he did. He still believes he did the right thing by killing his children, and it's part of his delusional disbelief. He still firmly believes it, and nothing that's happened since then in all these years and all these proceedings has changed his core delusion, which is a firm, fixed belief that he didn't have a choice but to kill his children, which is just really kind of sad, but that shows how seriously mentally ill he is and how trial counsel should have done. The jury knew that. If you just want to make the syllogism that this is such a terrible thing that he had to have serious mental problems, well, I mean, the jury knew that, right? The jury knew that. According to Dr. Small, then, he had a personality disorder. Well, I think what the point I get from Judge Rogers' question is that the facts of this case get you fairly, as a layperson, get you fairly far down the road in concluding that there's something seriously wrong with Mr. Mennon. Yes. Yes. And the point is there needed to be a more specialized psychologist to explain what that serious mental illness is. I mean, equating him to the Unabomber doesn't really help, and it's the idea that Dr. Small, then, found a personality disorder, and this leads to one of the other issues that's a sub-issue, but it shows how this claim kind of permeates everything else in the case. So there was an issue raised about the B3 mitigator, and the B3 mitigator in Ohio, as you know, is the one that says if somebody has, the defendant has a serious mental health issue. And the Ohio Supreme Court, when they were reviewing the application to reopen, because appellate counsel was ineffective for not raising the issue, they said, well, he just had a personality disorder, it doesn't fit this B3 category, because all Dr. Small, then, said was he had a personality disorder. If a neuropsych, and if Dr. Mosnick had been testified, the serious mental illness that he does have, the major depressive disorder with psychotic features, delusional disorder, autism, would have been under the B3 category. And that is why this issue kind of permeates all the other issues in the case and puts Mr. Mimone in a different light before everybody, from the trial court, even to this court, because it doesn't put the true facts about how seriously mentally ill he is and how that impacted his case. At least go ahead. One of your arguments is that counsel was ineffective by referring to B3, or by making arguments that essentially invoked B3 during closing. Right. Yes, Your Honor. At the penalty phase. Yes, yes, when they didn't have the evidence for the B3, because personality disorders do not fit that category of... He invoked the gist of it and argued to the jury that the mental issues are mitigating circumstances that should weigh against the death penalty. And your argument is, in fact... You're saying it was error in this case to reference B3, but you're saying he should have retained an expert who had given different testimony and then it would have been okay to invoke B3. Correct. That's correct. And B7 is sort of a catch-all. I mean, whatever side you want to take on it, these are all appropriate arguments under B7 are just general things the jury should consider. That's correct. But when the Ohio Supreme Court did their independent re-weighing of the aggravators and mitigating circumstances, they noted that they gave less weight to the B3 part... They didn't give any weight to the B3 mitigator because personality disorders under Ohio law are not a serious mental illness. But they did recognize it under the B7. But they've also consistently said that that catch-all has less mitigating effect, and I believe that was the language even used here, than even the serious mentally ill mitigator. And that's why it's important. By they, you meant the justices of the Supreme Court? Yes, the Ohio Supreme Court. When they do their independent re-weighing... You're not currently making the argument that I thought you were making, that there was prejudice from the, I don't know, instruction or the speaking to the jury saying you can rely on B3 and didn't mention... Or no, it said B7, but which one? They mentioned one but not the other. You're not relying on that now? No, I'm not. I'm just illustrating how that permeates the entire case when the evidence of his serious mental illness is not fully presented and fully before the court. Judge Rogers is asking this because this is one of the issues you argued separately. I thought one of your grounds for appeal was the B3, the invocation of B3 when that wasn't appropriate. So that is an issue in the case. Yes, it is an issue in the case. You're sort of arguing the flip side of that issue, which is if we don't agree there, the answer is then you should have gotten a different expert who then would have let you argue B3. My time is up. You may answer Judge Ryder's question to the extent it wasn't... Well, I just wanted... ...to the extent you didn't. It feels like... I think he just wanted you to affirm what you were arguing. So the argument that is in the appeal is that the trial counsel was aired by arguing B3 when they had no evidence for it. And our argument now is if trial counsel had retained a qualified neuropsychologist, they would have had the evidence for the B3 and they would have been able to present that as a mitigator. At the time that that argument was raised and the application to reopen, there was no neuropsychological report yet. The lay jury would have digested all these distinctions and potentially would have come out differently. Potentially, yes. If the jury had... That argument in your brief? Which argument? The flip side of the argument that you clearly do make in the brief, what he's calling the flip side. So, yes, the argument in the brief which we... They didn't have enough evidence for... The argument that's in the brief about the B3 argument is not that this evidence would have been enough for the B3. It was just raised as trial counsel was ineffective for raising B3 when they didn't have the evidence for it. Okay. But the other argument you're making now, right? Well, my suggestion is... I'm not sure whether the other argument was in the brief. I guess it wasn't. That it permeates everything? Well, you may have said permeates everything, but you didn't give us an example that B3 would have been mapped. Or did you? So we can find it. You're not following my question? I see what you're saying, Your Honor. I see what you're saying. So the argument about not being able to get a neuropsych is a neuropsychological report is that part of the assumption would be that had a proper neuropsych like Dr. Mosnick had been able to testify, she would have been able to present evidence of a serious mental illness that would have met the B3. Whether or not we made that as a specific argument in the brief, I can't recall, but it does permeate. All right. We'll hear from Ms. Fosnow. Thank you. May it please the Court, we ask this Court to affirm the judgment of the District Court. I guess I'll focus on the neuropsychologist claim, too, since that's what opposing counsel focused on. The State Court ruled that essentially a petitioner, when he filed the State Petition for Post-Conviction Relief, was merely presenting a contrary conclusion. The State Court said that wasn't sufficient to establish a Strickland prejudice or a Strickland claim, and that's what the District Court held here as well, that without showing that counsel was ineffective for relying on Dr. Smaldon, or that there should have been some reason to assume that there was more testing warranted than that you presume the effectiveness of trial counsel and the Strickland claim fails. And here, Dr. Smaldon interviewed Mimone seven times over 20 hours, performed numerous tests, including neuropsychological tests on Mimone, and did that because he had been told about Mimone falling and hurting his head in a bike accident, and said that prompted him to pursue the neuropsychological exams. And he found no evidence of a brain disorder or brain damage. And so... Was he qualified to do that? He said that, I mean, he is not a neuropsychologist, but he said in his testimony that he has been requested by neuropsychologists and neurotherapists. I don't know what all the terms are for all the neurodocs, but he said he's been asked to do those tests before by neuroconsults, and he has done them before, and he did that in this case. And interpret them? Yes. And he did that in this case. He talked about it extensively in his testimony during the penalty phase about his tests that he did in this case. In addition... Do you know which of the tests he did would be considered neuropsychological in nature? I don't, but I... I'll see if I can find it in here. What I'm actually exploring is to what extent there's duplication, if you can tell me to what extent there's duplication between what Dr. Spaulding did and what your adversary claims a neuropsychologist would have done. It starts at page 11-6, that's the document number, and page ID 6070, and he talks about the cognitive and neuropsychological testing. I'm not sure what the differences between these are that opposing counsel would have liked him to do, but at page ID 6073 are all of his various tests, and they're listed in order. So I just refer you to that. But I need to go back because in this case the district court found that Dr. Mosnick's testimony, her affidavit, her statement, her inquiry and assessment are barred by pinholster because the state court reviewed this on the merits. So the district court said that a habeas court could not even consider Dr. Mosnick's evidence in this case in reviewing the neuropsychological claim because it was reviewed on the merits in the state court, and this court and federal courts are bound by the state court record as it was at the time they reviewed the claim. Opposing counsel is trying to get around that, like the U.S. Supreme Court said in Shin v. Ramirez by arguing the Trevino exception. If you say post-conviction counsel was ineffective, then you can get cause to excuse the procedural default. But Shin said that Martino's exception doesn't go beyond the cause exception. It cannot be used to allow federal habeas courts to review evidence that was not before the state court and was never presented to the state court. They said the cause exception is a judge-made exception. 2254E2 is in the AEDPA statute, and the court has no authority to amend that statute to allow extra exceptions. And in this case, Dr. Mosnick's evidence would also be barred for any procedural claims. It appears that opposing counsel is arguing that it was error for the trial court to not allow money for a neuropsychologist to evaluate Mamone in presenting evidence in the post-conviction action. But that would seemingly be a claim of error in post-conviction, which is barred by Kirby v. Dutton. I can't think of a circumstance where this court would allow such a claim to be made about error in post-conviction review. So opposing counsel said that all she has to do is convince one juror in the penalty phase. Now that would have been the case at the trial and on direct review, but we're here on habeas review, and her burden is to show that no reasonable fact finder would have found that the mitigating factors did not outweigh or would not have imposed the death penalty. And here she cannot do that based on the evidence that's before this court. As the district court noted, there was no reasonable probability of a different result in this case. The facts of the case are just so egregious, and the crime was just so manifestly... I have a couple of process questions I don't think I know the answer to. Smalldon is retained by the defendant? Right. Does the state retain psychological experts or mental health experts in these cases? I believe they do in some cases where their evaluation would... where they wouldn't agree with the defense. They didn't retain one in this case? No. Has the state ever retained Dr. Smalldon? Yes. Is he typically retained more by the state or defendants or both? I actually don't know that. I'm not... Retained by both, you don't... Right. I do know that. Is there a Dalbert or Fry process in these proceedings where you can move to exclude an expert, a motion to eliminate to exclude an expert because their testimony is unreliable? Yes. I know it's a civil rule. I don't know how it works. Right. I mean you could... I mean it could be brought before the court that it's not an area that's subject to testable scientific inquiry. Okay. So that didn't happen? It can be done. That didn't happen here? No. And the second expert, Dr. Stinson, that was presented on post-conviction review, was also an expert retained by the defendant. So all the experts in this case have all been retained by the... Do you know Small had never been excluded from a case? Not that I'm aware of. And he actually said that he... Your friend on your side knows. She can... Right. And he actually said that he's found people not guilty by reason of insanity before. Well, I mean he doesn't find that, but he has found evidence that he would argue that the person would satisfy that criteria in certain cases. He didn't in this case, but he has found that in other cases, and he talked about that at trial. So as to the B3 and B7 criteria, the district court did find that trial counsel did err in referring to that criteria, but he found that that was not an error that would qualify as a deficient performance, and he again found that there was no doubt that here the result of the proceeding would have been the same, but he found it extremely doubtful that it would have changed the result. And in this case... You're referring now to? Judge Carr, the district court. Right. The district court noted that trial counsel argued the catch-all exception in essence in his argument. He argued that the jury could find whatever criteria they believed supported a life sentence in this case and argued that they should evaluate all the factors collectively. He did argue that in his view that no one could have done this crime but for being crazy, and he argued that the way he committed this crime and then talked about it matter-of-factly in his confession or in the penalty phase does show in his words, he said, in my words, craziness, and presented that to the... Who is he referring to now? Trial counsel. Right. And the judge, as you noted, mentioned the catch-all exception, instructed the jury as to the catch-all exception, and the jury was free to evaluate the evidence that was before them and give it any weight they wanted as to the mitigating weight of the evidence and to find in favor of life, and they found that the mitigating factors did not outweigh the aggravating factors in this case. And so opposing counsel cannot demonstrate, Mimone cannot demonstrate prejudice in this case as to just simply referring to the B3 criteria. Can I ask you one issue that your friend on the other side did not raise? So I understand Ohio law during the sentencing phase allows the defendant to allocute, what I would use, unsworn. Right. This defendant, Mimone testified or spoke for five hours.  That's a long time. That is a long time. Are you aware of any other case where a defendant in this circumstance has spoken for close to that length? Is that common? It struck me as uncommon. I am not aware of any. I'll admit, I don't do capital cases. This is my first. Perfect. So I don't know the answer to that question. It does seem like the trial court gave this defendant a lot of leeway, in part I guess because he was making the unsworn statement as a soliloquy or whatever. He wasn't being asked questions and the judge did tell him eventually to wrap it up and he was like, I'm done. Five hours most of the time. Right, right. I'm not aware of a judge that would allow someone to go on. A question that that raises in my mind about the nature of this statement. It's unsworn. Is the jury told it's not evidentiary in nature? I mean, what do you tell a jury about that? I'm not certain what the instruction was regarding it, but under the Ohio law, defendants, it's their right. They get to decide whether they're going to give an unsworn statement or not. They're allowed to do it and the jury, I would assume, is free to weigh it. Right. In federal court to speak at sentencing, right? Right. And I assume, I mean the jury I believe could give it whatever weight they wanted and if they found that dude must be crazy and watching him, they could vote for a life sentence and they didn't here. They evaluated all of the aggravating factors, the mitigating factors. As I, in referring to the not guilty by reason of insanity defense, there's an argument whether he can conform his actions to the law and whether he knows the difference between right and wrong. And here in his confession, he said, I knew I had already violated the restraining order, so I just went on with what I was doing. This was before he killed the kids and the ex-mother-in-law. On the elocution issue, given it's the defendant's right to do this. Right. So can it ever be an effective assistance where the counsel doesn't stop? I mean, I guess the point is the counsel is supposed to stop the defendant when it's the defendant's right. The court says it's kind of a strategy as well. The Ohio Supreme Court said it's a strategy issue as well and it's best left to the people that are able to observe the jury and the tenor of the trial to see how it's, whether it's appropriate in that circumstance. And here, the district court found that it gave Dr. Smalden the opportunity to observe him and refer to that during his penalty phase. It gave Mimone the opportunity to tell the jury his position and what his view of his background, just kind of familiarize the jury with himself, relate to the jury. And in this case, the court found that, the district court also said that in doing this,  the opposing counsel hasn't presented anything to say that trial counsel didn't try to discourage him from doing a five-hour statement or that counsel didn't say, maybe I should ask you questions and we can go back and forth. And Mimone's like, no, I want to do it my way. There's no evidence to say that. So they would have to produce something saying that I asked my attorney to engage in some kind of back and forth with me and he didn't or my attorney gave me no advice regarding this unsworn statement. Or as well, like, as to strategy, that there would be no strategic reason to allow him to do this. And there were in this case, there were strategic reasons. And as I said before, trial counsel, in his statement to the jury, said it's hard to see how he could commit these crimes and talk about what he did so matter-of-factly as if he were just going to the grocery store. But the jury was, again, presented with that. And it's hard to imagine a person that can do that. But he did and so he presented it to the jury to allow them to theoretically maybe override Judge Smaldon's, I mean, Dr. Smaldon's evaluation to say, again, there's something else beyond what Dr. Smaldon says with this guy and he's crazy. I mean, the jury could have done that. They didn't in this case. But as to that catch-all exception, they could have said, I think the guy's crazy and that's the reason that he did it and so I'm going to give him a life sentence. And they did not do that in this case. They could have said he's nuts, but death is appropriate for nuts. I mean, for crazy people. I mean, they were instructed as to how they were supposed to evaluate the aggravating circumstances and the mitigating factors and what weight they were able to give certain things. I don't think they were instructed that you could sentence him to death for being nuts. I'd have to review the instructions. But you don't know what? We presume juries follow the instructions that they're given. I don't believe they were given an instruction that said that you could. I wasn't suggesting that. Right, okay. And then if there are no further questions, we rest on our brief and ask this court to affirm the judgment of the district court. Ms. Wernicke for rebuttal. Thank you, Your Honor. It's curious that the focus of Dr. Smalden and how, like the unsworn statement that you brought up, it's our position that counsel wasn't effective for not intervening and not stopping that sooner. We don't know because we weren't provided any kind of hearing, either at post-conviction or at the habeas level, as to what kind of information they provided to and direction. The defendant has the right. He does. He does have the right. I mean, if counsel stands up and says, stop, stop, stop, that strikes me as a bad thing. That's innocent of the jury. In other words, I'm just trying to imagine a circumstance where the defendant has this right and invokes this right and counsel can be ineffective. In this circumstance, though, Your Honor, he started his unsworn statement. They took a break for lunch, and then he was allowed to start talking again. They took another break in the afternoon, and then he started talking again, and finally the judge said, you know, Mr. Mimone, wrap it up. And soon as he said that, James quit. And it was almost like he needed somebody to tell him to stop. Any of those, during those breaks, I mean, you wouldn't want to do that in front of the jury because that would not be good. But during any of those breaks, trial counsel should have said, you know, Your Honor, you know, we're going to stop. This isn't productive, and he needs to be curtailed or maybe even ask the judge to instruct him to say, hey, you need to wrap it up. That's tough, but then you come in and say, you know what, counsel's ineffective because if you'd given that extra 30 minutes, he would have convinced the jury otherwise. Just a hard, it really feels like either a judgment call or basically the defendant's right to do what they're going to do, and it's hard to imagine. And it's hard to imagine. Counsel would be ineffective no matter what they say. Correct. And it's hard to imagine that any defendant who's fighting for his life convincing a jury not to sentence him to death by an unsworn statement. And it's such a unique part of the Ohio law, and as far as I know, the jurors are instructed that this is not evidence because it is unsworn, and they can take it, give it any kind of weight that they want. And it's not the same thing as regular testimony. Your opponent suggests that, for all we know, in the interim breaks he may have been advised to speak no more than one minute after you go back on. You don't know. Is that true? I mean, it would have made this particular argument stronger if there was some indication that, given that he has the right to give it even if he's told not to, this ineffective assistance of counsel claim would just fail on its face if, in fact, he took every chance he could to keep him quiet and failed. Do you have some sort of responsibility to show that that was not the case? That's what they argue. Right. When the issue was raised in post-conviction, they were raising it as it might have been raised at trial. They couldn't put forth any. I think it was raised on direct appeal. They couldn't present any evidence outside of the record. And while normally that might be true that you, you know, it is their right, there needs to be at least some way of curtailing it. But I'd like to get back to the main issue, and that is about Dr. Smaldon and the fact that they tout that he spent 20 hours with Mr. Mimono for seven days, which meant he only spent a couple hours with him each time. They point out that Dr. Mosnick spent 13 hours with him over two days doing her evaluation. And while Dr. Smaldon was retained by neurosurgeons and neurologists to do neuropsychological workups, he never testified that he actually diagnosed any brain impairment in any of those people because the testing that is done by psychologists that's relied on by medical doctors is to help them with their diagnosis of brain impairment, that he wouldn't necessarily be the one to make that diagnosis. And I just want to reiterate that the issue is, the main crux of our issue about the issue with the neuropsych is that the fact that the state court impediment in post-conviction that prevented post-conviction counsel from getting the tools they needed and the resources they needed to fully prove the claim. And the logic of, well, you didn't prove your claim in post-conviction because you weren't given the funding and therefore we're not going to let you have, we have to give deference to this decision that was made that didn't have all the facts needed that we now have. And we would ask that this court find that habeas relief should be granted and that Mr. Mahmoud's death sentences be vacated. Thank you. We appreciate your arguments and we'll consider the matter carefully. With no other arguments this afternoon, the court may adjourn court. This honorable court is now adjourned. Thank you. Thank you. Thank you. Thank you. Thank you.